Good morning. May it please the Court. Burton Gross appearing on behalf of Verizon California, the appellant and cross-appellee in this matter. Pursuant to the Court's scheduling order, we will address now only the issues on Verizon's cross-appeal. I'd like to start first with the issue of Verizon's claim that the CQC violated the FCC's ISP remand order by imposing rates for internet-bound traffic above the FCC's capped rates for a 17-month period after Verizon had already invoked its termination rights. The CQC's decision to impose rates above the FCC's caps during that gap period was contrary to both the language and the broader intent of the ISP remand order. Now, as the Court is aware, there are actually two periods within the 17-month gap period. The first period is a four-month period from December 2001 to April 2002, which is the period after Verizon had invoked its termination right but prior to the date on which the contract was due to expire. And then the second period is the 13-month period beginning on April 13, 2002, which was the period after the contract was due to expire. The reasons why the FCC's caps should go into effect differ a little bit for those two periods, so I want to address them separately. And I'd like to turn first to the 13-month period after the contract was due to expire. During that period, the CQC could not lawfully impose rates above the FCC's caps because there was no existing contractual obligation that actually compelled that outcome. And in the absence of such an explicit obligation, the FCC's rules require that the caps go into effect on a going-forward basis. The commission basically extended the prior contract. And do I understand what you're saying is that in doing that, it also had to find a specific obligation? What I'm saying is that under the FCC's rules, the first sentence of paragraph 82 and the second sentence of paragraph 82 have to be read in combination with each other. And the only situation in which the CPUC can decide to vary from the first sentence, in other words, a sentence that requires it to impose reciprocal compensation on expiring or expired contracts, including expiring contracts, the only situation in which it can do that is if there is in fact an existing contractual obligation that compels a rate higher than the FCC's caps. Now, Section 9.02 of the agreement, which is the provision that was at issue when we're talking about the latter period, the period after April 13, 2002, that does not state any intent by the parties one way or the other. It establishes no substantive rule of any kind with respect to whether reciprocal compensation should be paid or with respect to any other aspect of the nature of the ongoing interconnection agreement that will occur after that, or the terms of interconnection. And therefore, during that period, there was no contractual obligation to pay rates higher than the FCC's caps. Again. Even though the bar contract was continued. Well, what the CPUC was entitled to do is to establish an interim arrangement. But, yes, even if the contract was continued, because the contract in that situation would be an expiring contract within the language of the first sentence. I just don't understand the expiring argument. I mean, I understand where it comes from, but I don't fully understand it, because it seems to me very clear that what the language of, what is it, paragraph 82, whatever it is. It is paragraph 82. It means is that once you get into the mode where you've got an expired or an expiring contract and you're negotiating for a new agreement, during that negotiation the relevant universe is the universe of this cap. Right. And that's, we were in that period. But it doesn't say that when the contract is expiring, whatever that means. I mean, it's expiring theoretically from one moment after it was negotiated, because it's going to be expiring sometime. So this doesn't make any sense. Well, I don't think that's what the FCC meant. And that's why in the first sentence the FCC said its rates are going to affect as carriers renegotiate expired or expiring contracts. Parties don't renegotiate contracts at the very beginning. They renegotiate contracts at the end. And in this contract there was a. They have to negotiate with reference to the capped rates. Well, they have to negotiate with reference to the capped rates. But at the time that the contract becomes an expiring contract, the FCC's capped rates go into effect, because the word as means during, while, or at the same time as. But that proves too much for the reasons suggested by Judge Reimer. Does that mean as soon as they begin negotiating a contract two years into the life of a five-year contract, the rates of the contract no longer apply and we're subject to the cap? No. It means that if there's a contract that does not contain an actual obligation to pay rates above the FCC's caps, and that's the situation here. Even if the CPUC was extending the contract, as they claim, during the period after April 13, 2002, there clearly was not an obligation to pay rates higher than the FCC's caps during that time period. As soon as the parties actually invoke the renegotiation provisions in an existing contract, then the FCC's caps will go into effect, provided that there is not in that contract an existing contractual obligation to the contrary. The key here is that the Court needs to provide an interpretation of the first two sentences. And I acknowledge there is some tension between those first two sentences, but needs to come up with an interpretation that gives effect fully to all the language in both of those sentences. And the CPUC and PacWest's approach reads the word expiring out of the first sentence of the FCC's order, and it reads the word as, as meaning after. The only way you can actually reconcile the first sentence and the second sentence is to conclude that the words existing contractual obligation in the second sentence mean a contractual obligation that actually requires payment of reciprocal compensation at a rate that is different than what the FCC had in mind. I agree. In that sort of a situation, the second sentence of paragraph 82 would be the applicable sentence, and you would have a situation where the FCC's caps could not go into effect. But where you have a situation where there's a contract that does not create such an obligation, and it certainly does not create such an obligation with respect to the period after April 13, 2002, then the first sentence of paragraph 82 is the controlling one. This is also the only interpretation that is consistent with the broader intent set forth in the FCC's ISP remand order. At paragraph 81 of the ISP remand order, in other words, the paragraph immediately preceding the one we've been discussing now, the FCC makes clear that its goal was to address and curtail a pressing problem, specifically the distortion of the competitive marketplace, and to do so to the maximum extent possible. When the CPUC on April 12th, the day before the contract was due to expire, chose as a policy matter to impose the obligation for another 13 months, it was ignoring the FCC's admonition that its rates and its caps should go into effect to the maximum extent possible. So, again, paragraph 81 further reinforces my interpretation of paragraph 82. I will also say that that interpretation is dictated by the fourth sentence of paragraph 82. The fourth sentence of paragraph 82 is the sentence in which the FCC stated that states are no longer allowed to establish their own policy preferences in this area as of the effective date of the FCC's order. The FCC's order became effective on June 14th, 2001. Now, it's undisputed that section 9.02 does not create a substantive obligation of any particular kind to pay rates above the FCC's caps. So, under the fourth sentence of paragraph 82, the only thing that the state commission could do is give effect to the FCC's caps, as would be consistent both with the other language in paragraph 82 and with the language immediately preceding it in paragraph 81. I do want to point out, though, however, and this goes back to an earlier question that was being asked, even if this Court rejects my interpretation, even if this Court concludes that the word expiring does not have any particular meaning in this instance, nonetheless, for the period after April 13th, 2002, Verizon is clearly entitled to the benefit of the FCC's caps. That's because as of that date, the contract, by its expressed terms, expired. Now, the contract has, in section 9.02, provisions that clearly establish a specific timeline for expiration of the contract. It provides first that if a party wants to terminate the contract, it can do so on 60 days' notice. And then it provides for one and only one 125-day extension period if the other party chooses to renegotiate. That's what PACWES did, and it's undisputed that the end of that renegotiation period was on April 13th, 2002. So, on that date, the contract had, in fact, expired. Again, it's true that the CPUC on the day before, or at least one commissioner of the CPUC, established a new interim arrangement that would establish what the terms of interconnection would be during the post-expiration period. But that doesn't change what the actual language of the contract means with respect to whether the contract expired. And I should mention that the CPUC has itself expressly stated, in the arbitration decision that is at issue here, in D03-05-075, the commission expressly stated that the contract expired as of April 13th, 2002. This is found at page 2 of the arbitration decision, on page 202 of Verizon's excerpts of records. There, the CPUC stated that PACWES' previous interconnection agreement, actually, it uses the words ICA, but that's an interconnection agreement, with Verizon, expired on April 13th, 2002. The CPUC cannot run away from that statement, and that finding was, in fact, correct as a matter of law. The contract expired on that date, and at least as of that date, the FCC's caps should have gone into effect. Now, I do want to very briefly touch upon the period prior to that, the four-month period that I mentioned at the beginning. During that period, the first sentence of paragraph 82 had been, was triggered because the parties were renegotiating at that point, and the contract was expiring. The issue then becomes whether, under the second sentence of paragraph 82, there was some existing contractual obligation to pay rates above the FCC's caps. If there were, then I agree that the caps could not go into effect. However, the 1996 agreement says nothing whatsoever about imposing reciprocal compensation for Internet-bound traffic. It doesn't mention Internet-bound traffic at all, and, in fact, the only way that Verizon ever came to pay reciprocal compensation for this traffic was as a result of the Commission's generic 1998 Internet order, where it decided on an industry-wide basis, for the entire industry, that in every contract that makes reference to paying reciprocal compensation for local traffic, it will be deemed that that means also that reciprocal compensation is applicable for ISP-bound traffic. That decision was reversed by this Court in the Pacific Bell versus PacWest case, and with the reversal of that decision, any argument that there was an existing contractual obligation to pay reciprocal rates above the FCC's caps evaporated. And for that reason, even during the four-month period, which is a period when the contract was expiring rather than expired, the FCC's caps should have gone into effect. If there are no questions on that, I'd like to turn very briefly to our second argument, the argument that the CPUC aired by imposing reciprocal compensation on virtual NXX traffic. Just to go back and recap, virtual NXX calls or VNXX calls are calls that appear local based upon the party's telephone numbers, but that are actually connecting parties that are located far apart. This is accomplished by the carrier for the called party, in this case PacWest, assigning a local telephone number to a customer who is actually located in a distant exchange. What's the purpose of that from PacWest's standpoint? The purpose of that is because some customers don't want to have people who call them incur toll charges, so they want to have a local presence in various places. And for that reason, it behooves PacWest to be able to give those customers local telephone numbers in different places, even though they are not physically located in that place. So the question comes down, do you look at those calls as they are in fact, or look at those calls as they are based on the arbitrary assignment of the NXX? The telephone numbers. That's exactly right. And in the 1999 virtual NXX decision, the commission spoke very clearly on this issue and addressed it. The CPUC held in that decision that from the standpoint of the caller, which is the retail rating of the call, from the standpoint of the call, we don't want a situation where the caller ends up being charged long distance charges for a call that appears local based on the telephone number. So for that purpose, we'll consider the call to be local, which is perfectly fine. It then turned and said that with respect to inter-carrier compensation, we're not concerned about that issue. What we're concerned about is avoiding a situation where a carrier can manipulate its inter-carrier compensation charges simply by the telephone number that it chooses to assign to its distant customer. And so therefore, and this is specifically on page star 19 of the Westlaw version of the VNXX decision, the CPUC unequivocally stated that for inter-carrier compensation purposes, the retail rating of the telephone numbers will not be considered in determining whether reciprocal compensation shall be paid or whether inter-carrier compensation shall be paid, but rather the actual physical routing of the call will be determinative. And the actual physical routing means the endpoints. So that is this routing and not retail rating rule is the rule that came out of the 1999 decision. The arbitration decision here based its conclusion that the call should be deemed local and subject to reciprocal compensation entirely upon the fact that the telephone numbers of the calls make it appear to be a local call. That is exactly what the 1999 decision said the commission could not do. So we have a situation where the state commission has expressly, without any explanation, deviated from the general principle that it established in its generic ruling. That is a classic case of arbitrary and precious decision making. But if there's an additional cost on a VNXX call, which there usually is with a long-distance call, that's why you pay long-distance charges. Shouldn't that cost ultimately be assessed to the company who wants a local presence, even though it's in Skokie, Illinois or someplace? Well, I think that's right. And that's why we're now actually, in a way, getting to the other issue, PacWest issue. That is the reason why it makes sense that the CPUC held on the VNXX transport issue. That's the issue about whether or not the calls will be deemed inter-exchange for that purpose. That's why the CPUC was correct in deeming the call to be inter-exchange and therefore subject to transport charges to the distant location. Our position is that, like PacWest, we agree that the CPUC cannot have it both ways in that regard. The 1999 decision is clear, both at page star 19 and also at conclusion of law 5 and at ordering paragraph 3. In all of those places, the CPUC makes clear that it is the routing point of the call that will determine all forms of inter-carrier compensation, whether it be transport or reciprocal compensation. And by departing from that standard in this decision, the CPUC violated its own rules. Now, it's true the CPUC refers to other decisions, earlier arbitration decisions, where it's done the same thing. But those add nothing to the analysis because when one looks at those decisions, the same thing is true. In every instance, the sole basis upon which the CPUC concluded that the call is subject to reciprocal compensation was because the telephone numbers make it appear to be a local call. Finally, I'd like to point out that PacWest and the Commission tried to suggest that Verizon, that in fact the VNXX decision somehow holds the contrary and explicitly states that VNXX calls are subject to reciprocal compensation. If that had been the position of the CPUC in the 1999 decision, it would have stated so expressly. Nowhere in the decision does the CPUC state that its retail rating rule should apply also to inter-carrier compensation. In fact, it states quite the contrary. It states that for inter-carrier compensation, the routing points of the call are determinative. And it cannot be the case that there's – what PacWest and the Commission rely upon is a stray reference at the end of the decision to the 1998 generic internet order, which they suggest somehow means that the CPUC has ruled here in the VNXX context that these calls are not subject to reciprocal compensation. That simply cannot be true. That is saying that a background and unelaborated reference to an earlier decision on a different issue is going to eviscerate the central tenant of the rule that the CPUC established in the 1999 decision. And that simply cannot be correct. I have 30 seconds on the paging issue. The bottom line there is that what the CPUC allowed PacWest to do by stripping out paging calls is it allowed it to depart from the FCC's 3-to-1 ratio without rebutting the accuracy of the FCC's ratio. And that is something that the FCC does not allow. It's clear under paragraphs 8 and 79 of its order that you either apply the ratio or you rebut it. But if you rebut it, the party needs to actually show that the amount of internet-bound traffic it has terminated is not accurately measured by the ratio. Thank you. Thank you, Mr. Brooks. Good morning. Pardon me. Good morning. I'm Tony Rodriguez for PacWest. The CPUC and I have agreed to split our time 12 minutes for PacWest, and may it please the Court. I'd like to begin with the discussion of how the Commission resolved the party's impasse and kept the 1996 agreement in effect until the next agreement became effective, and to take a step back and consider the standard of review that applies to that decision by the Commission. We submit it would pass any standard of review, but it's particularly important to consider here that the standard of review applies to the State Commission given that the State Commission was interpreting an agreement and using its powers as a State Commission that the standard of review is arbitrary and capricious. An arbitrary and capricious review imported from Administrative Procedure Act cases is highly deferential and presumes the agency's decision is valid. Here, the CPUC's actions pass that standard. What the CPUC did was work with an agreement, and the agreement's terms are very simple. They're in a paragraph or two, and they're on the record at page 18. When the parties created the 1996 agreement, they agreed that there could be different scenarios by which they would either end their relationship or wind down the 96 and negotiate a successor agreement, the scenario by which the parties would end their interconnection. And it's very important to remember that parties who wish to be interconnected must have an interconnection agreement. In the scenario where the agreement ends and the parties go their separate ways, one party gives the other a notice of intent to terminate. The other does not request negotiation for a new agreement, does not state, we wish to remain interconnected. In that case, interconnection eventually ends in 60 days, and the parties are no longer interconnected, and they go their separate ways. But the second scenario, when a party requests negotiation, we wish to remain interconnected, which means we must have an interconnection agreement, is with this case involved. PACWES gave that notice. There's no dispute it gave the notice. And under the contract that the parties agreed to, this opened a 125-day negotiation window. The contract states that during those 125 days, all of the terms and conditions remain in effect. The contract does not state, on day 126, the agreement ends, the parties go their separate ways, with negotiations having failed, the penalty is termination of interconnection. Now, in fact, Verizon argued that's what it meant, that on day 126, there's no longer interconnection, and Commissioner Peavy, the assigned commissioner who handled the request by Verizon to address the impasse, rejected that argument, and that's in our supplemental excerpts or record at page 22. But I don't think the issue is whether the interconnection is terminated. The question is, what are the terms upon which the interconnection is continued? That is the question, Your Honor, and I think that's not at odds with Commissioner Peavy rejecting the idea that interconnection has ended. On what terms does it continue? The agreement states for 125 days after request for renegotiation, the terms and conditions that are in the agreement stay in effect. But on day 126, from then until the next agreement becomes effective, the CPUC will provide the terms and conditions. The parties set up a dispute resolution mechanism and negotiated for and took a calculated risk as to what the CPUC would do in the course of filling in the terms and conditions for what remained a period of the 96 agreement. And where does the CPUC get the authority to set terms and conditions that conflict with the cap imposed by the FCC? The CPUC does not have the authority to violate federal law. However, the CPUC here did not violate federal law because it was working within an existing agreement and agreement that provided for a period during which the CPUC would provide the terms and conditions of the final phase of the 96 agreement. And the CPUC itself acknowledged, conceded, what have you, that when the new agreement becomes effective, we will take as a given, if you will, my words, that the FCC rate caps and rate structure applies to that new agreement, and so they did. And there was never any question or hesitation on the CPUC's part about the new agreement, but it was this existing agreement, which included the terms I've outlined, for how the parties terminate or set up the stage for the next agreement. It's this existing agreement and the obligation to abide by the CPUC's resolution of their disputes. It's that existing agreement that the CPUC interpreted and enforced and executed. And as Verizon argued in one of its briefs, the CPUC imposed the term when it should have just interpreted. And our comeback has been it's not interpreting if you win and imposing if you lose. It's interpreting either way. And it's a power that the district court recognized the state commission had and that the parties had specifically given it. So I submit, Your Honor, that there was no conflict here with federal law. What part of the contract or what part of the statutory regulatory term gives the CPUC the authority, if I can say it this way, to extend the contract beyond day 126? I think that's, in effect, what it did. If you take the position that the CPUC extended the agreement, that is a state law power that the commission exercised in its interpretation and enforcement powers, which it's well settled the act allows state commissions to interpret and enforce. They cannot interpret or enforce in conflict with federal law. But here there is no conflict with federal law. And this relates to some of the points the panel was raising regarding the term expiring and the words and the structure of the paragraph 82 of the ISP remand order, which state that the remand order does not affect existing contractual obligations. It is true that the remand order states it applies as carriers renegotiate expired or expiring agreements. But it's very important to remember that sentence does not state this applies to existing agreements as carriers renegotiate expired or expiring agreements. And even if you were to think that sentence is perhaps ambiguous, the next sentence in that very same paragraph removes any ambiguity because it says this does not affect existing contractual obligations. In other words, we left the phrase existing obligations out of the first sentence for a reason, because it doesn't affect them. And various courts cited in our papers have held it's prospective only. The right structure and its caps apply to new agreements. This was an existing agreement. Commissions interpret and enforce their powers all the time under contractual agreements. And as long as they don't violate federal law, it's pretty much their zone, subject to a deferential standard of review. We assume that that's the case here. On the issue of an existing obligation, I'd like to note that Verizon assuming has brought this action based on approximately an 18-month period, but has never disputed or explained why it paid millions of dollars for a five- or six-year period. That Verizon has never brought a challenge to the CPUC claiming that it does not know this compensation, that the CPUC ruled when Verizon attempted to invoke the right structure, that the change of law provision shielded, did not apply, rather, to the FCC right structure, and that Verizon had to pay the reciprocal compensation rates. Verizon never appealed that decision. And that Verizon's own papers in this case state that it's beyond the scope of this appeal to challenge its obligation to pay reciprocal compensation. Verizon cites a page, actually a sentence in one page of the record in the background section of the CPUC decision regarding to the expiration of the agreement. But the record is replete with references to expiration of the 125-day window, to the CPUC continuing all the terms of the agreement, to the right structure not applying until the new agreement becomes effective, and again, as I mentioned earlier, to a specific rejection of the contention that interconnection ends on day 126, that the agreement terminates on day 126, and the parties are left completely separate. This agreement could have said that, but it didn't. Instead, it said the parties will seek resolution from the CPUC. That's what they did. In fact, Verizon brought the paperwork and the motion and invoked Section 9.02. And as the district court noted, the CPUC had the authority to set the terms of the agreement from the close of the negotiation window until the new agreement became effective. The CPUC's decision was not arbitrary or capricious, is entitled to substantial deference, and working in the four corners of a document, doing what commissions do all the time, interpreting the agreements before them, they did not violate federal law. I'll turn very briefly, if I may, to the VNXX traffic. I'd like to note that Decision 9909029, the CPUC decision cited by Verizon, as supposedly stating routing points would control compensation, said no such thing. It specifically stated we are not here establishing inter-carrier compensation. We're beginning the process. It laid down policy markers, if you will. Included among the things to be considered were routing points, but nowhere in there is an exclusive emphasis on routing points stated. Indeed, the document references, you consider interconnection agreements, you consider the volume of traffic exchanged, you consider routing points. These are things we'll be looking at, and so the CPUC did. It's also important to remember that when the CPUC decided there that VNXX traffic is local, in many ways the die was cast, that that traffic would receive at least reciprocal compensation. The CPUC went on to try to graft onto this the call origination charges, reasoning that it was inter-exchange as some sort of hybrid. The reciprocal compensation part proved to be accurate, correct, and reasonable. Grafting on a portion of an inter-exchange access regime, as I'll discuss in my next block of time, was not reasonable. But the important thing here is that Decision 99 did not establish that routing points would control compensation for this traffic. Finally, on the paging point, we submit that an analysis of the ISP remand order by its plain terms in paragraph 79 shows that the FCC gave carriers the opportunity and the ability to carve out sections of traffic that were indisputably not subject to the rate caps, such that the FCC and the Virginia... You can make the carve-out when you're trying to prove that the three-to-one ratio is wrong, but I see nothing in there that allows you to take something out when you're doing the initial ratio. So I think the question there, Your Honor, is what is reasonably consistent with the objective here, which was to identify ISP traffic and to recognize the difficulty... But I prefer, if I can do it, just to stay with the terms of the order, and it says absolutely nothing about carving anything out of the ratio. Understood, Your Honor. The FCC dealt with a similar issue in the Virginia arbitration order, where the parties disputed whether toll traffic could be backed out of the three-to-one. And one party contended the FCC didn't mention toll traffic, but the FCC itself said it's reasonably consistent to remove toll traffic from this calculation of three-to-one. And the rationale I submit there, toll traffic obviously is not subject to this rate structure, would govern our paging traffic, which everybody agrees gets reciprocal compensation, not the FCC rate caps. I'd like to turn it over to the CPC, if I may. May it please the Court. My name is Lindsay Brown on behalf of the California Public Utilities Commission and the commissioners of the California Public Utilities Commission. I don't want to repeat the arguments that PAC-West has already made. We are in agreement on most points or all points here. First, I just want to discuss briefly that the CPC lawfully extended the terms of the agreement during the 125-day renegotiation period. That's between December 3, 2001, and April 13, 2002. I think there's little dispute on this. The terms of the contract, section 9.02, specifically state that during this renegotiation period, the terms of the 1996 agreement would remain in place. The ISP remand order states that the new rate regime does not apply to existing contractual obligations. Section 9.02 makes it clear that during that 125-day period that's an existing contractual obligation that the terms of the 1996 agreement remain in place. Does that address the question of what happens after? No, I'll turn to that right now. I just wanted to get that one out of the way, and then I'll turn to what I think is probably the more contentious issue. That is after April 13, 2002, and that was the end of the 125-day renegotiation period. What happened in this case was 10 days before that, on April 3, 2002, Verizon filed an emergency motion with the CPC because the 125-day period was going to end, and they wanted to make sure that an interconnection agreement remained in place. The Commission looked at section 9.02, and what it stated was that if parties were not able to reach a new agreement by April 13, 2002, or at the end of the 125 days, both parties agree to seek resolution from the CPUC. This part of section 9.02 makes it clear that the parties intended to reach a new agreement within this negotiation period, and that was the intent of the contract. However, that didn't happen here. So the parties came before the CPUC. We had 10 days to figure something out was basically what it came down to. We didn't have time to negotiate a new agreement. We didn't have time to do much of anything. Because the terms of the contract had already extended, because section 9.02 had already extended the terms of the contract within that 125 days and said, okay, now go to the CPUC to arbitrate, the only resolution that we could make was to continue the terms of the 1996 agreement. We felt that section 9.02 made that fairly clear, and that's what we did in this instance. We believe that this agreement did not expire until a new interconnection agreement was reached, and that was several months later after the arbitration decision. In fact, that wasn't until 2003. And that's our position on this. And I want to get discussed briefly. Verizon talks about how the commission has admitted that the agreement was expired. And, in fact, the interim order, which was the decision that stated that the terms of the 1996 agreement would continue during the arbitration period, makes it clear that the 1996 agreement never expired. The commission stated, under the ISP remand order, the FCC's cap rates are to take effect as carriers renegotiate expired or expiring interconnection agreements. The parties have not yet renegotiated the expiring interconnection agreement. At this point, they've only agreed to disagree and leave it to the commission to resolve how to continue interconnection after the end of the 125-day window period until the parties renegotiate or arbitrate a replacement interconnection agreement. By creating a limited 125-day window in which the agreement would continue in effect during negotiations, the party's stated intent was to execute a replacement agreement within 125 days of the date that the agreement terminates. Yet the parties reached no agreement concerning what interconnection terms would apply after the 125-day window, assuming no agreement. Instead, parties agreed to seek the commission's determination of contract terms after April 13th if there was no successor agreement on that date. I think that makes the commission's position very clear, that we do not view this as an expired contract. So you're looking at the commission's authority to do what it did as emanating from the party's contract. Yes, and under federal law, we have the authority to interpret interconnection agreements. And the FCC ISP remand order states that the new rate regime does not apply to existing contractual obligations unless there was a change of law provision. Now, Verizon cannot complain that it did not negotiate this into the contract. Perhaps it should have, but it didn't. But that's not a violation of the law. Now, there's a slightly tricky question here. You're arguing that CPUC has the authority to interpret the contract. We do have the authority to interpret the contract. Now, in ordinary situations, that would be a question of law. Let's say, what's the contract mean? Right. Which we would have de novo review over. Well, I guess. Arbitrary and capricious review over what, in most circumstances, would be a pure question of law. Let's just say, what's the contract mean? Right. We submit that this is a state law interpretation. Yeah, but if we're reviewing, for example, a decision of a state court on a question of, excuse me, if we are reviewing a question of state law, that's a de novo determination. We don't sit directly on appeal over questions of over the state courts, but just because it's state law doesn't mean it's not de novo, but it's somehow de novo because it's coming up from an administrative agency. I'm not sure you're wrong, but I want to make sure that I understand precisely the question. Well, I think Verizon's position is that it's de novo because it's interpreting federal law. That's their position, interpreting what's the meaning of expired and expiring. We submit that that's a state law contract issue. As far as what the terms of these contracts actually mean. And as a state law contract, do you think our review, even though it's a question of law in that sense, is nonetheless arbitrary and capricious? We think it's more factual review, but, yes, we do think it's arbitrary and capricious. We think it's more just reviewing the terms of the actual contract and what that means, and that's an arbitrary and capricious standard. In the 30 seconds I have left, I just want to state briefly Verizon's point on the reciprocal, that the commission did not have authority to impose reciprocal compensation on virtual local traffic. They rely on a generic decision by the CPC, the VNX, the so-called VNXX decision. I just want to briefly cite to a part of that decision which states, in short, we find that neither position of the competitive local exchange carriers nor of the incumbent local exchange carriers provide a completely satisfactory resolution of the inter-carrier compensation issue. And what we basically decided there is we're not sure what the right answer is. This is a complicated issue. The FCC agrees virtual local traffic is local because it's rated as local, but it does travel outside of the local calling area. So we found a resolution here that we believed was fair. We imposed reciprocal compensation on it, on virtual local traffic, because the calling and call parties believe it's local. And then we'll discuss later the call origination charges that we imposed. Thank you. Thank you. I now speak about what we term call origination charges. These are charges that the commission allowed Verizon to assess on PacWest for carrying VNXX traffic to the point of interconnection, which I'll sometimes call the POI. Could you just explain in language I can understand exactly what charges are involved in the reciprocal compensation aspect of VNXX traffic and which are involved on this aspect? Certainly. If Your Honor is Verizon and I'm PacWest, if one of your customers calls one of my customers, I collect reciprocal compensation from you for taking the call from our point of interconnection and finishing it over my system, if you will, to the person your customer is trying to reach. So you pay me reciprocal compensation. If one of my customers calls you, I pay you reciprocal compensation. These charges are one of your customers, forgive the pointing, one of your customers calls one of my VNXX customers. You, for taking your customer's call to our point of interconnection, assess me a charge. Which is outside of the local area code, right? A number assigned to it. It's a number assigned to the same calling area, but it goes to a person who's in a different calling area. The point of interconnection is outside the area code. Yes. Well, it might be. Let's put aside area code. It's outside the local calling area. Okay. Okay. Well, yeah, but in, I mean, kind of in, I don't know if it's dollars and cents terms I'm looking for or something. I mean, I understand what you've just said, but what I don't entirely understand is whether there's any overlap, whether they're for different transporting costs or what. Hold on. There is no offset or credit between the two. They're independent. So PacWest receives X amount in recip comp because it is a call that comes to, that is locally rated that comes to the point of interconnection, and PacWest takes it over from there. PacWest gets recip comp. Verizon. That does not include a cost of transporting the call beyond the exchange area? That recip comp is supposed to compensate PacWest for taking the call and, if you will, finishing it. It's now reached the point of interconnection. PacWest takes it to the customer, incurs a cost for doing so, and under federal law is entitled to compensation from the originator of that traffic. So it's reciprocal compensation because someone else, some other carrier's customer made a call to our customer. We had to finish the call. I'm being very layman in these terms. I hope it's not interfering with the court's question. Go ahead. Okay. The standard of review to the call origination charges question is de novo because it's a question of federal law. Does federal law prohibit the CPUC from allowing a carrier to assess a charge on us because it carries traffic to the supposedly distant point of interconnection? And in examining this question, we submit that the court, as it's held in other cases regarding the Telecommunications Act, should interpret the act in light of its pro-competition goals and in recognition that ILACs have an inherent competitive advantage because for decades they've built and owned these networks. No, but this just runs, I mean, not to consider the inter-exchange traffic and assess the cost for it seems to me just to allow a complete free ride on the part of the competitive LAC. The argument that this is a free ride is something that's been made in courts and in commissions across the country and is something that the FCC is considering in its current rulemaking. Would that have any capacity to move this issue? I'm sorry? Would the FCC's current rulemaking have any potential for moving this issue? The current rulemaking includes the issue of what should inter-carrier compensation arrangements be for BNXX traffic. And the FCC, looking at its existing rules, acknowledging there's a rulemaking underway, it has been for several years, in the Virginia Arbitration Order concluded that the better fit with existing federal rules is to forbid charges like this because traffic that originates on one carrier's network and goes to the point of interconnection, federal law prohibits that carrier from collecting charges for the traffic it originated. This is not to say it has been resolved finally, but it's currently the FCC's position that the better fit with its rules is not to allow charges like this. This was a virtually identical, if you will, situation that the Virginia Arbitration Order dealt with. It was an FCC decision that circuit courts have given deference to and has never been challenged, questioned, or modified. In doing so, the FCC and this Court, we submit, should recognize the right under federal law of a CLEC to select the point of interconnection. The whole idea of the Telecommunications Act, in fact, was to give the CLECs at least a small leg up in taking on these entrenched monopolies. And for the CPUC to say, well, because you've picked one poi and it's distant, you now need to compensate the ILEC, turns the statutory scheme and purpose completely on its head. And that's not consistent with how the Act is to be interpreted, and it's not consistent with how the FCC said current existing rules, what's the best fit? The best fit is you forbid charges like this. The idea that the Commission had, if you will, a substantial evidentiary record on which to make this decision is also subject to reversal, even under an arbitrary and capricious review. The CPC is not allowed to cherry pick the record and find a few phrases and offer as evidence that it is in fact feasible and workable to base a compensation system on actual routing points and termination and originating points. The same argument was made to the FCC in the Virginia Arbitration Order by a Verizon company just a few months before the arbitration in this case. And in Virginia, the Verizon company stated, conceded in the FCC's words, it didn't have a way to work this out other than using rating points, that it was the industry standard, that there was no feasible alternative in the FCC's words to making a determination and running billing systems in real time that it can tell you where a call begins and where it ends and at rating of the calls by the NPA and NXX numbers were the only feasible alternative. In this case, record evidence identified in our briefs before the commission, there is no way for the billing systems to identify the physical location of a called and calling party. Record evidence that they currently do not bill each other based on physical location of called and calling party. And all the CPC was left to do was to say, well, someday, PAC-West, you could develop the functional capability. And it's been several years in this case, but there's yet to be any definition of what functional capability that could be developed in the future, how that helps us in the here and now under an interconnection agreement that needs something feasible to govern the billing arrangements. We submit that the FCC's expertise in handling of this issue, within a few months of the same issue in this case, with a Verizon company that acknowledged it didn't have a way to work around this other than using the NPA and NXX numbers, reveals that the CPC overreached in the record, disregarded contrary evidence, and its own purported evidence was really speculation and conjecture. How is PAC-West disadvantaged by this rule? The effect of this rule, Your Honor, is that PAC-West can't use its single point of interconnection arrangement that it exercised under federal law. To avoid these charges, PAC-West had to move from a single point of interconnection and build out to be able to meet Verizon traffic closer, if you will, to where the traffic begins. So the advantage rests, as you see, with Verizon as the incumbent and the disadvantage with PAC-West as the competitor. Yes. Because they had the larger system that we're talking about here. They have a larger system that they built over decades, literally decades, and had a lot of options for how they did it because they only had to please themselves. Then comes the 96 Act. The new carriers can't possibly be expected to replicate what the old carriers have done. The Act recognizes barriers to entry and enshrines in federal law the right to select a single point of interconnection. And the circuit court cases we've cited in our briefs protect that right and tell state commissions you cannot use a long haul or a cost causation analysis to compensate, if you will, ILEX for having to carry traffic out to the POI. They're supposed to carry it to the POI, and that's our position here, Your Honor. Thank you very much. Thank you. Your Honor, pursuant to the court's order, we have ten minutes, and we've agreed to split it five minutes and five minutes with the commission, so I'll speak for five minutes and then turn it over to the commission. First of all, PAC-West is simply incorrect to say that the FCC has in any way ruled that for VNXX calls, origination charges may not be imposed. The Rule 703B is the rule that they're referring to there. That's the rule referring to that identifies the circumstance under which origination charges cannot be imposed. The FCC itself, the full FCC, not the Wireline Bureau, has repeatedly said that that rule applies only to local traffic. It said that in the Inter-Carrier Compensation NPRM, which is 16 FCCR 9610. In paragraph 112 of that ruling, the FCC stated that, quote, our current reciprocal compensation rules preclude an ILEC from charging carriers for local traffic that originates on the ILEX network. Local. It didn't say VNXX. It didn't say inter-exchange. The FCC's rules only bar transport charges to the extent we're talking about local calls. Next, I want... Why shouldn't one be mesmerized by the fact that the commission, in fact, said this was local and then said it isn't? What? The state commission, you mean. State commission, sorry. Right. Well, we agree that it's problematic for the state commission to have considered this traffic to be both local and inter-exchange, and we don't support that position. But we... Do we have to pick which one is right? That's correct. This court needs to... What this court should do is it should vacate... Both can't be right. We do not believe that both of those things can be correct. We believe that federal law does not compel reciprocal compensation for VNXX traffic, which is the argument that PACWES made. But we also believe that under the 1999 VNXX decision, the CPUC has stated the principle that should be adopted for all inter-carrier compensation for this traffic, and that is that the rating point, the retail rating point, may not be used to determine whether the traffic is subject to inter-carrier compensation, and rather the actual physical transport of the traffic will be determinative. And there's a good reason to do that. The reason to do that is to avoid CLECs being able to manipulate inter-carrier compensation payments, inter-carrier compensation, and avoid transport fees simply by assigning a local telephone number so that it doesn't appear as though the call is a long-distance call. I do want to briefly discuss and respond to the CPUC's suggestion that there was not substantial evidence in the record. That is simply incorrect as well. The CPUC had ample record evidence that PACWES knows where its wires end and where it delivers calls to its customers. In fact, PACWES's own witness testified to that effect, and it's in our briefs. Given that, and that's all that the CPUC had to conclude in order for it to also conclude that VNXX traffic can be separated out. What the CPUC had in front of it in addition to that was evidence in both comments and briefing from Verizon, indicating that the way one would do that if you don't have telephone numbers, given that the telephone numbers appear local, is to do a traffic study. What a traffic study is is a situation where the carrier takes a look on some sampled basis at the calls that are coming in from Verizon, and it looks at who those are being terminated to, and it does a sampling to determine some sort of a factor of the call, similar to the one that was used in the three-to-one ratio, but some kind of a factor that would then be used on a going-forward basis to say, well, based on our traffic study, this percentage of the calls are to VNXX customers, and this percentage of the calls are not to VNXX customers. That is what Verizon's comments suggested the commission to do, and the commission was fully within its authority to choose to do that. The Virginia Arbitration Order did not in any way establish an express rule against the use of traffic studies to measure this traffic. In fact, various state commissions that are cited in our brief have done just that after the Virginia Arbitration Order was adopted. So that issue, the issue of lack of substantial evidence is really a red herring here. I see that my time has expired, and so I will now cede to the CPUC. Thank you. I know this issue is a bit complicated, and that's because the nature of VNXX traffic that is virtual local traffic is complicated. It's a call that is rated as a local call. The person who's making the call thinks it's local. The person who's receiving it thinks it's local. But we all know that it isn't, that it travels outside the local calling area, and the FCC has been grappling with this for at least five years. That's when they opened a proceeding to examine this issue, and they still have yet to come out with anything. Well, can both of your decisions be right? Yes, we believe so, because we have in the past, and we do in this case separate rating and routing, and that's what we've done here. For rating purposes, that is for the amount that customers are paying and think that they should be charged, this is a local call because that's what customers think. They think they're dialing a local call. That makes sense from the customer's point of view. But the question is, so far as the carrier's point of view is concerned, can you have it both ways? Can one hand be local and the other hand be in? We believe it can, and there are other examples of this that I'll discuss briefly where we've done that. And the FCC has actually done this in certain instances as well with high-speed service. So this isn't a novel idea. This has happened before. We have a type of traffic called foreign exchange service where a customer obtains a local presence in a different community, but the customer pays to transport those calls from the central office where the customer wants to establish a calling presence. An example of this is the local county seat for San Mateo is actually in Redwood City. So for a flat fee, about a dollar a month, the community can pay to have a foreign exchange service between San Mateo and Redwood City so they're not constantly making toll calls because that would be prohibitively expensive. And there's other types that we've done, too, where we've done extended local calling area service where the local area has been sort of artificially expanded, and, again, there's a flat fee paid for this. So the same sort of idea. This isn't a novel idea. What's happened here is we have been waiting for some guidance from the FCC, and the FCC itself has been confused on this issue and has issued conflicting decisions on this. And what we've done is just tried to be as fair as possible. We recognize that the first six digits of a telephone number, that is the area code, and the first three digits determine what the rating of a call should be, and if those are the same from customer to customer, even if they're not in the same local calling area, we have to rate that as a local call. That is our position. However, in fairness to Verizon in recognizing that they have to pay for costs to transport this way outside of the local calling area, we've decided that the fair thing to do is impose a call origination charge that PacWest must pay Verizon to compensate for the long haul expenses of these types of calls. These are calls that PacWest, you know, wants to have this virtual local traffic. It wants customers to have this, and that's fine, but we think that there has to be some fairness involved here and they can't just get a windfall. And that's what we've tried to do here is just find the best resolution until we get some guidance from the federal government or from the FCC. I've discussed briefly the record in this case. PacWest claims that there is no record to support that it knows which traffic is virtual local traffic and which traffic is not. And it is in its best interest to make that argument because it doesn't want to pay these charges. However, there is substantial record evidence to show that PacWest has the functioning capability to differentiate virtual local from non-virtual local calls. I have right here actually some testimony from two PacWest witnesses, Sumter and Hahn, which indicate that they do know where its endpoints are. And it's also a matter of logic. PacWest knows where the end of its networks are, where the end of its wires are, and it can't make a claim to the contrary. PacWest could have also conducted traffic studies, which it hasn't done, but it could, and we've asked it to do so, and so to date has not. PacWest relies on this Virginia Arbitration Order, that's the FCC, or it's WorldCom v. FCC, which in that case the FCC found that Verizon had not made a compelling argument for traffic studies, but it did not say that traffic studies could not be done. Just in that case it didn't feel that Verizon had met its burden of proof. Here we felt that they had, and that's where the difference lies. The FCC did not rule out this type of thing. PacWest made several preemption arguments that we're out of time, so I won't discuss them. Thank you. Any questions? All right. Counsel, we appreciate very professional arguments and briefings on matters that have already been submitted.
judges: Rymer, T.G. Nelson, W. Fletcher